A. R. TINGSTAD, *Respondent*, v. NATIONAL BANK OF COMMERCE OF SEATTLE, *as Executor, et al., Appellants.*[1]

[1] Reported in 216 P. (2d) 236.

*Skeel, McKelvy, Henke, Evenson & Uhlmann* and *Robert S. Ivie,* for appellants.

*Hall & Cole,* for respondent.

GRADY, J.—This action was instituted by A. R. Tingstad against the National Bank of Commerce of Seattle, the executor of the estate of Rowland F. Meggee, deceased, and Harper-Meggee, Inc., to secure a decree of specific performance of a contract. The trial court entered such a decree, and defendants have appealed. The bank will be referred to as the executor, Rowland F. Meggee as the decedent, Harper-Meggee, Inc., as Harper, Tingstad & Hampton as the partnership, Tingstad & Hampton, Inc., as the corporation, and the individuals by their surnames.

Prior to May 2, 1938, the partnership was engaged in the retail appliance business at Everett. Harper was engaged in the business of wholesaling and distributing household

appliances at Seattle. The decedent was president and managing officer of Harper and the owner of a majority of its capital stock. The partnership was a customer of Harper, and there existed a very friendly business relationship between the partners and decedent.

By May 2, 1938, the partnership was indebted to Harper in the sum of about $13,500. It had suffered financial reverses to the extent that its assets and liabilities were substantially the same. The business had been impaired, and it was not possible to secure adequate credit. Liquidation of the business was imminent, with the resulting loss to the partners and the creditor.

Harper and the partners desired to make some arrangement whereby the business would continue to operate, Harper would retain a good customer and would eventually receive payment of the indebtedness. To these ends, a contract was executed. It is too lengthy to set forth in full, but the material parts are as follows:

The contract contains recitals of friendly business relations, the occurrence of financial reverses, and that Harper was willing to co-operate in a reasonable plan as outlined in the agreement to be made for the liquidation of the indebtedness, but upon condition that it be placed in a position where it could adequately protect itself. The contract provides that a corporation should be formed to be known as Tingstad & Hampton, Inc., with an authorized capital stock of $16,000, divided into 640 shares each of a par value of $25 per share, of which 40 should be common shares and the balance of 600 shares preferred. The initial capital of $1,000 was to be subscribed and paid for by Harper, which was to receive the 40 shares of common stock to be held subject to the terms of the contract, and Harper was to be in control of the corporation. The partners agreed to transfer all of their interest in the partnership, including good will, to the corporation. In return, the corporation was to assume the liabilities of the partnership. The partners agreed to subscribe and pay for 40 shares of the preferred stock each year and agreed to purchase from Harper the 40 shares of com-

mon stock when the corporation had provided sufficient funds to pay its indebtedness, including any future indebtedness, to Harper. The partners agreed to serve as officers of the corporation, and it was specifically provided that, in so far as the general public was concerned, they should be the active managers, and under no circumstances was the interest of Harper in the business to be made known to the general public or the trade people without Harper's consent. The partners were each to be paid a salary of $150 per month for devoting their full time to the corporate business, and in addition to their salaries they were entitled to an annual bonus in the amount of the net income of the corporation over and above all taxes and other obligations, but the bonus was to be immediately invested by them in the preferred stock of the corporation. The contract provided that nothing therein contained should serve to release the partners from their obligation to subscribe to at least $1,000 of preferred stock of the corporation each year.

The parties entered upon the performance of the contract, and the 40 shares of common stock were issued to Harper. In June, 1940, Hampton withdrew from the corporation, and thereafter its affairs were managed by Tingstad. The corporation was not an immediate financial success, and by the close of its fiscal period ending April 30, 1941, it had a deficit of $9,497.57. The partnership account, which had been assumed by the corporation, had been written off the books of Harper in March, 1940, as a bad debt. Commencing about May, 1941, the business began to show a profit. Sometime in October, 1941, Tingstad and the decedent apparently reached an understanding of some kind, but due to the death of the decedent and the inhibitions of Rem. Rev. Stat., § 1211 [P.P.C. § 38-3], the trial court could not have the benefit of their testimony. On that date, decedent addressed the following letter to Tingstad, upon which an acceptance was endorsed:

"Mr. Ray Tingstad,                                    October 23, 1941
Tingstad & Hampton, Inc.
Everett, Washington
Dear Mr. Tingstad:
    "This will confirm our understandings of today.
    "Effective November 1st, you are to receive a salary from Tingstad & Hampton of $200.00 per month, and Mr. B. E. Nelson is to receive a salary from Tingstad & Hampton of $175.00 per month.
    "In addition to the above, the personal account of yourself is to be credited with 10% of the net profit. The personal account of Mr. Nelson is to be credited with 5% of the net profit.
    "These credits, however, are not to be drawn by either yourself or Mr. Nelson, but are to remain as a credit balance to be used at some future date in acquiring stock in the Corporation of Tingstad & Hampton.
    "The net profit allowance is to start October 1st, 1941.
                                    "Yours very truly,
"ACCEPTED:                          HARPER-MEGGEE, INC.
    [signed] A. R. TINGSTAD."       By [signed] R. F. Meggee

Commencing about April 30, 1942, Tingstad drew 10% of the profits in the form of a cash bonus. In 1944, the decedent acquired the common stock of the corporation from Harper for the sum of $1,000, but this transaction was unknown to Tingstad until after the death of decedent. Neither of the former partners ever acquired any of the preferred stock of the corporation, and apparently all parties were content to leave the surplus in the business. During the years from 1946 to 1948, Harper granted to the corporation a discount in prices on certain appliance items. There is testimony that there were a few instances of discounts prior to 1946, but these were relatively minor. Subsequent to May, 1941, the business of the corporation continued to prosper, and the volume of its business together with the discounts enabled it to build up a book surplus of $46,686.02 by April 30, 1948. During all of this time, no affirmative action appears to have been taken to liquidate the indebtedness to Harper in the manner provided in the contract. Prior to trial, Hampton assigned his rights in the corporation to Tingstad.

Rowland F. Meggee died in February, 1948. His executor claimed the ownership of the assets of the corporation by virtue of his apparent ownership of all of the issued stock. The appellants took the position that the agreement of October 23, 1941, amounted to an abrogation or modification of the contract of 1938 as to the right to reacquire the common stock of the corporation upon payment of the indebtedness to Harper, and that thereafter the status of Tingstad was that of an employee on a salary basis whose sole right to acquire stock in the corporation was limited by the 1941 agreement. Respondent claimed that the contract of 1938 was a security device and its only effect was to furnish Harper security for the indebtedness; also that the 1941 agreement was intended only to effect an increase in salary.

The contract of 1938 created a comprehensive plan whereby, if it worked out successfully, Harper would receive payment of the indebtedness owing to it by the partnership, and the business enterprise would continue to be a going concern. Although Harper paid the initial capital of $1,000 with which the corporation commenced business and received in exchange therefor the 40 shares of the common stock of that par value, it was contemplated that whatever title to that stock Harper acquired was subject to defeasance by the covenant of the partners to purchase it when sufficient funds had been provided for the payment of the debt to Harper. No definite time was fixed within which the indebtedness was required to be liquidated. It is very clear from this carefully prepared contract that it was intended to be and operate as something in the nature of a security device, but more properly as a combined liquidation and rehabilitation plan.

The question then arises as to whether the agreement of 1941 changed the objective sought to be attained by the contract of 1938. We gather from the argument presented by appellants that their theory is the agreement of 1941 in effect abrogated the 1938 contract, and it therefore must be inferred that Tingstad waived or lost his right to acquire the common stock of the corporation from Harper upon

there being available corporate funds with which to pay the indebtedness to Harper. The agreement, taken by itself, falls far short of being sufficiently complete so that it can be said it amounted to a substitute for the contract. All it accomplished was to increase the monthly salary of Tingstad, fix one for Nelson, and change the amount of annual bonus from the net income to 10% and 5% respectively of the net profits. Instead of the bonus being immediately invested in preferred stock, it was to be "used at some future time in acquiring stock in the corporation."

It would seem that, if it had been agreed that such an important right as the acquirement of the common stock by Tingstad when the indebtedness was paid would no longer exist, it would have been so stated in the agreement. If we reach the conclusion asked by appellants, we must do so by inference from the subsequent conduct of the parties. The record contains much documentary evidence, and there is also other evidence directed to this end, and much stress is placed upon the effect to be given the discounts from wholesale prices on the sale of merchandise by Harper to the corporation. There is also evidence of the subsequent conduct of the parties which is as consistent with the continuance of the original plan set out in the contract and the right to repurchase the common stock as it is with its abrogation. It may be that Meggee considered himself the absolute owner of the common stock, but we find nothing to sustain a finding that Tingstad ever agreed to modify or abandon his rights under the contract. If Meggee had been living, so that he could have testified, and Tingstad could likewise have given his version of the conversations and transactions had between them, the problem now before the court might have been of more easy solution; but upon the record before us, we must hold that the appellants have not established their theory by a preponderance of the evidence. A consideration of the record convinces us that the agreement of 1941 was merely a modification in some particulars of the 1938 contract, but the right of respondent to acquire the common

stock on payment of the indebtedness was never in any way abrogated or abandoned.

■ The appellants urge the doctrine of laches as a defense to the action. They contend that Tingstad is not entitled to the aid of a court of equity to require specific performance of the contract because of his long delay in offering to pay the indebtedness to Harper and purchase the common stock. We think that any fault in these respects which may be charged to Tingstad is likewise chargeable to Harper and later to decedent. At all times, Harper had such control over the corporation and its affairs that it could have required the liquidation of the indebtedness. The financial statements in the record show that there were times when the corporation had money and other assets which could have been applied to the indebtedness consistent with the continued operation of the business, but all parties acquiesced in the indebtedness remaining unliquidated. In such circumstances, the doctrine of laches is not available to appellants as a defense.

■ It is also urged that, if Tingstad is entitled to specific performance of the contract, he should be required as a condition to make restitution in the amount of the discounts allowed to the corporation, upon the theory that he who seeks equity must do equity. The contract makes no reference to discounts in the sale of merchandise by Harper to the corporation, and in our consideration of the questions before us we cannot concern ourselves with what motivated Harper in making discounts. It does not appear from the record that any conduct of Tingstad influenced the decedent or Harper in making special prices, and though the profits of the corporation were enhanced by this practice it does not follow that the corporation was unjustly enriched. The discounts were voluntary acts of Harper made to further the attainment of an objective, and gave it no legal or equitable right of reimbursement. Tingstad, having offered to fully execute the contract and having made a tender of all the contract required of him, became entitled to specific performance.

The appellants contend that respondent should have added to the tender, interest on the indebtedness from May 2, 1938. If Harper had chosen to bring an action upon the indebtedness instead of entering into the contract, it could have recovered interest by virtue of Rem. Rev. Stat., § 7299 [P.P.C. § 677-1]. *Daniel v. Daniel,* 116 Wash. 82, 198 Pac. 728, 27 A. L. R. 177. The debt was due and liquidated as of that date. We are of the opinion that the effect of the arrangement made by the parties was to defer payment of the indebtedness until such time as the corporation had provided funds with which to make payment. By April 30, 1946, there was a book surplus of over $13,000 in the business, but it does not appear that there was sufficient cash on hand at any time to pay the indebtedness in full. When the contract was made and a plan devised for the liquidation of the principal indebtedness which might involve a long period of time, it would seem that, if the parties contemplated the payment of interest, the contract would have so provided. The control Harper had over the affairs of the corporation was such that it could prolong the time of liquidation even though the corporation was in a position to pay the debt, and thereby in effect turn the indebtedness into an investment. The whole plan of liquidation seems to have in mind the payment of the debt, the rehabilitation of the business, and the ultimate acquirement of the common stock by Tingstad. We are of the opinion, when looking to the whole arrangement, that it was never the intention of the parties that interest should be paid upon the indebtedness, and its payment should not now be required as a condition of specific performance.

The judgment is affirmed.

SCHWELLENBACH, HAMLEY, and DONWORTH, JJ., concur.

HILL, J., concurs in the result.

———————

May 1, 1950. Petition for rehearing denied.